1           UNITED STATES BANKRUPTCY COURT

2           WESTERN DISTRICT OF WASHINGTON

3                   AT SEATTLE

4    _____

5    In re:                    )
                               )
6    IAN GREGORY THOW,         )        No. 05-30432
                               )
7           Debtor.            )
                               )
8    _____

9      TRANSCRIPT OF THE DIGITALLY-RECORDED PROCEEDINGS

10        BEFORE THE HONORABLE PHILIP H. BRANDT

11               NOVEMBER 8, 2007
     _____

12

13

14

15

16

17

18

19

20

21

22

23   Reported by:  Robyn Oleson Fiedler
                    CSR #1931
24

25

```
 1                    A P P E A R A N C E S

 2

 3           For the Debtor:

 4                   MR. LARRY B. FEINSTEIN
                     Attorney at Law
 5                   VORTMAN & FEINSTEIN
                     500 Union Street, Suite 500
 6                   Seattle, WA 98101

 7

             For the Canadian Trustee:
 8
                     MR. BRUCE W. LEAVERTON
 9                   Attorney at Law
                     LANE POWELL
10                   1420 Fifth Avenue, #4100
                     Seattle, WA 98101
11

12           For various Canadian media:

13                   MR. C. KEITH ALLRED
                     Attorney at Law
14                   DAVIS WRIGHT TREMAINE LLP
                     1201 Third Avenue, Suite 2200
15                   Seattle, WA 98101

16

17

18

19

20

21

22

23

24

25

                                                              2
```

```
 1              DIGITALLY RECORDED IN SEATTLE, WASHINGTON

 2                        NOVEMBER 8, 2007

 3                          --ooOoo--

 4

 5              THE COURT:  So the Thow matter.  Well, I will

 6      start by noting the presence of Mr. Allred representing

 7      various Canadian media, Mr. Leaverton representing the

 8      Canadian trustee, Ms. Riley and Mr. Feinstein

 9      representing the debtor, and I understand Mr. Cheevers

10      and Mr. McLean are on the telephone.

11              Let me say a few things to begin with.

12      First, it seems to me that the order -- the request for

13      an order shortening time is moot.  I understand this

14      hearing was scheduled with the agreement of all the

15      parties.  And so unless there's some -- somebody that

16      disagrees with that, we'll simply strike that motion as

17      moot.

18              With respect to the Global BCTV motion to

19      intervene, which came in, I believe, yesterday, it

20      doesn't seem to me to present any different or

21      additional issues.  And my inclination is to treat that

22      simply as a joinder in the previous media motion.  If

23      the trustee or the debtor have any different position,

24      let me know now.  Otherwise, we'll simply treat it in

25      that fashion.
```

```
1              MR. LEAVERTON:  I believe that's all right,
2       Your Honor, by the -- unless the trustee speaks up and
3       tells me he has an objection, then I think that's fine.
4              THE COURT:  All right.  So that motion -- the
5       outcome of that motion will be the same as the outcome
6       of the other motion -- the earlier motion that
7       Mr. Allred filed.
8              So that brings us to the main motion.  And
9       I've spent a lot of time in the last two days reading a
10      lot of things, the pleadings and cases and so on.  And
11      I haven't really -- I don't think I've reached a
12      tentative ruling.  I really do want to hear the
13      argument.
14             I will point out that we have some 10:30
15      matters which are somewhat complicated and have been
16      ongoing things that I'm going to need to finish today.
17      And so that's about the time we have got this morning.
18      I understand there may be some urgency to a ruling in
19      this case, and so I'd like to hear from the parties on
20      that.  If necessary, we can reconvene mid afternoon or
21      something, or this afternoon or even tomorrow morning.
22      But I just simply have to wait until I hear some more
23      on -- and we see where we are.
24             It seems to me there are several questions.
25      The first one -- and this one I suspect I know the
```

4

```
1        answer to.  Does it make any difference that the moving
2        parties that would be intervenors are Canadian?  And it
3        it seems to me that probably doesn't make any
4        difference.
5              The next question is whose rules apply with
6        respect to the 2004 examination?  Is this a proceeding
7        in a U.S. bankruptcy court and, therefore, U.S. rules
8        apply?  Or is this somehow, because of the operation of
9        Chapter 15 and the Canadian UNCITRAL equivalent, a
10       Canadian proceeding simply transplanted south of the
11       49th parallel?  And then there -- that's the Chapter 15
12       kind of issues.
13             There's also the less formal, but significant
14       question of comity, whether or not -- if the U.S. rules
15       apply, nevertheless, what deference should be paid to
16       the Canadian practice, which I understand it is to
17       exclude non-parties from the equivalent of a 2004 exam.
18             Then there's the question, "Is the 2004 exam
19       discovery or a court proceeding?"  Section 107 of the
20       Bankruptcy Code, or Rule 5001(b), I think it is, seem
21       to me only applicable to court papers in proceedings
22       and not directly applicable to discovery matters unless
23       they are -- unless transcripts or exhibits are actually
24       filed in court as part of a pleading or perhaps as
25       exhibits in a trial.  And that's also true with respect
```

5

```
1        to the civil local rule 5(g)(1), I think it is, of the
2        Western District of Washington.
3                So there are some major questions here.  This
4        is first impression on a lot of issues.
5                So with that, Mr. Allred?
6                MR. ALLRED:  Thank you, Your Honor.  Your
7        Honor, just for the record, so that we have a complete
8        record, I'm appearing here on behalf of CHEK TV, the
9        Times columnists and Global BCTV.
10               THE COURT:  And Global BCTV, is it also a
11       Victoria station?
12               MR. ALLRED:  No, it's a television station in
13       Vancouver.
14               THE COURT:  Okay.  So we have Victoria --
15               MR. ALLRED:  So you have Victoria press and
16       Vancouver press -- or Victoria media and Vancouver
17       media.
18               THE COURT:  Okay.  And there's no contention
19       that any of these media outlets are anything other --
20       they're not seeking to intervene on any basis other
21       than media and public interests.
22               MR. ALLRED:  That's correct.  We're not
23       seeking to intervene to --
24               THE COURT:  As far as we know, Mr. Thow paid
25       his paperboy.
```

6

1          MR. ALLRED:  2004 exam or anything like that.
2      We are intervening merely for the purposes of being
3      able to listen in any 2004 exams that occur from now on
4      and getting a copy of the transcript of what occurred
5      on the 29th.
6          THE COURT:  Which I understand is in the
7      works.  I don't know if it's completed or not.
8          MR. ALLRED:  I don't know whether it's
9      completed yet or not.
10         Let me just address the issues.
11         THE COURT:  Before we get into the issues,
12     what's your view on timing?  How urgent is the ruling
13     on this?
14         MR. ALLRED:  Well, our view is it is quite
15     urgent.  If you've read a lot of these cases, you will
16     find in those cases the statement that, you know,
17     basically, access denied to the press is really a
18     denial on a fundamental nature.  And so the fact that
19     it -- you know, this stuff is important to the viewing
20     public and the reading public of my clients.  And if it
21     gets stale, then it's no longer of use.  And so we need
22     to get this matter resolved as quickly as we can.
23         That doesn't mean we have to have a written
24     ruling from this Court.  We need an oral ruling, at
25     least, so we know what's going on.  And if the Court

```
 1      likes to write a written ruling, that would be fine,

 2      but --

 3              THE COURT:  But that's likely to take longer.

 4      That's part of the reason for the question.

 5              MR. ALLRED:  Yeah.  And like I say --

 6              THE COURT:  Not likely to, would, in fact,

 7      take longer, even on a very expedited basis.

 8              MR. ALLRED:  Yeah.  And so if the Court --

 9      you know, we can certainly act on whatever the Court's

10      oral ruling is, and then, obviously, if the Court

11      wishes to put that oral ruling in writing, that would

12      obviously take some time, given the complexity of the

13      issues.

14              I'm just going to address some of these

15      issues that you raised initially, and then -- you

16      indicated that -- whose rules apply to 2004 exams.

17              THE COURT:  Oh, let me interrupt.  I didn't

18      really address the intervention question itself.  And

19      maybe we should -- I'm sorry to interrupt you as you're

20      starting, but maybe we should address that first before

21      we get into the access or not or transcripts or not.

22              I will say that my instinct is that the

23      intervention on the part of the media for the purpose

24      of getting the news out, so to speak, that that's a

25      proper intervention motion.  I don't think it makes any
```

8

```
 1          difference that the media are Canadian.  This is a

 2          proceeding that in some sense is happening in the

 3          United States courts, and it certainly is happening

 4          geographically in the United States.

 5                  So my inclination is to find that there is

 6          good cause for intervention on the part of the media

 7          and to grant the intervention motion.  But maybe before

 8          you go further, I should hear from the opposing parties

 9          on that question, and then we'll get to the other

10          question.

11                  MR. ALLRED:  May I address why we should be

12          allowed to intervene?

13                  THE COURT:  Sure, just very quickly.

14                  MR. ALLRED:  Well, first of all, I'd point

15          out in terms of the Canadian issue, just as people in

16          Canada and British Columbia listen to the local

17          channels here, those channels are also broadcast into

18          the United States.  And so we have United States

19          citizens listening to those as well.

20                  THE COURT:  Having grown up near Lynden, I'm

21          quite aware of that.  My school bus turned around in

22          Canada, as a matter of fact.

23                  MR. ALLRED:  I bet you couldn't do that now.

24          So in terms of the intervention, as I read the

25          pleadings, I didn't see an argument against
```

```
 1        intervention in the pleadings filed by the Foreign

 2        Representative.  The pleadings filed by the debtor do

 3        clearly argue that we ought not to be permitted to

 4        intervene.  And the applicable rule, as the Court

 5        knows, is 2018(a).  And the cases on which everyone

 6        relies -- in fact, every single case that I read -- and

 7        I can't state that I've read every case on the issue

 8        that's ever been written, but every case that I read,

 9        and that's quite a few -- they permitted intervention,

10        even in the cases where after intervention was

11        permitted, the press was restricted in some kind of

12        way.

13              THE COURT:  I don't think that the two

14        rulings necessarily track.  I mean, you could very well

15        win on intervention, but not get what you want.

16              MR. ALLRED:  Right.  And so even the cases

17        relied upon by the debtor, the Ionosphere Clubs case,

18        for example, they allowed them to intervene.  So I

19        think that that's an easy question for the Court to

20        answer.  I think that the public public interest, which

21        is represented by the media in these proceedings,

22        demands that they be allowed to intervene and be heard

23        in respect to the issues in this case.

24              THE COURT:  Let me hear from the other

25        parties on that before we go on to the other issues.
```

1        Mr. Leaverton?

2                MR. LEAVERTON:  Yes.  Your Honor, the

3        Canadian trustee does object to the intervention.  I

4        think it's not a matter easily disposed of.  And the

5        reason for that is I think we've all had a crash course

6        on prior restraint, First Amendment law and access to

7        court issues over the last couple of weeks.  I

8        certainly have.  And reading the cases that are cited

9        by the news media movants, and considering the cases

10       that we cited in our briefing, I think the common

11       thread here is that the media is routinely granted this

12       intervention right where there are court records,

13       matters of record in the court record available.

14                I think the only case --

15                THE COURT:  But this is about whether or not

16       it gets to be here even to make the argument.

17                MR. LEAVERTON:  I understand.  I understand.

18       And I'm -- on the one hand, I don't think the Canadian

19       trustee objects to having the Court consider these

20       matters.  And I think you're going to have to hear

21       argument on these underlying issues to really get at

22       the intervention issue.  Because here's the

23       distinction, I think.  And I think the only case I saw

24       that may differ with that is the Symington case.

25       Because I think in Symington, if I recall correctly,

1       there were not in-court papers involved that had been

2       gathered together.  And there was a media request to

3       get it because the notoriety of Mr. Symington, the

4       former governor.

5               And so I think what the courts have done is

6       when there are matters of record that the Court has

7       sealed or that are the subject of protective orders

8       where the public's right of access is being restrained

9       by an order of the court, a prior restraint, if you

10      will, then there is this presumption and the

11      intervention of the press, I think, right that comes

12      into play.

13              Here you've got kind of a more fundamental

14      question, which is we're not dealing with any order of

15      the court, per se.  What we're dealing with is --

16              THE COURT:  Well, we're dealing with an exam

17      that's conducted pursuant to an order of the court.

18              MR. LEAVERTON:  Right.

19              THE COURT:  Not quite like a deposition in

20      that regard.

21              MR. LEAVERTON:  Correct.  But I think the

22      question is I think the press stands in the same

23      relation as any member of the public who would want to

24      come before Your Honor and intervene and participate in

25      a 2004 exam.  And I think on that basis, if they have a

12

```
 1        presumptive right to intervene, really, so would any

 2        other member of the public.  Because I think what

 3        they're asking for is to get involved in an

 4        examination, not to see a record that's been sealed or,

 5        you know, a public right of access type issue.  And

 6        those are -- I think that's what triggers this

 7        intervention.

 8                THE COURT:  Ms. Riley?

 9                MS. RILEY:  Good morning, Your Honor.  I

10        guess first I should ask for the Court's permission to

11        argue this morning.  I have not filed a notice of

12        appearance in this case; nor have I asked to associate

13        in.  As you know, I do represent --

14                THE COURT:  I'm sure that can be rectified.

15        And certainly, go ahead.

16                MS. RILEY:  Very well.  And obviously, my

17        notice of appearance would be for this matter only at

18        this time.

19                I think Mr. Leaverton --

20                THE COURT:  This matter meaning those matters

21        relating to the 2004 exam?

22                MS. RILEY:  Exactly, Your Honor, not the

23        bankruptcy that proceeds the 2004.

24                As Mr. Leaverton pointed out, you know, I

25        think there are overreaching issues that we have
```

13

1  addressed -- or at least I have addressed in my

2  briefing ad nauseam, and that is the fundamental fact

3  that the 2004 exam does not involve pleadings or

4  hearings that are matters of public record.  This is

5  the fact that the distinguishes this case from all the

6  cases that are cited by the news media.

7    This is not a typical court proceeding where

8  you have documents that have been filed under seal or

9  where a party has requested a protective order.  As

10  Mr. Leaverton pointed out, this is somewhat akin to the

11  public seeking access to such an examination.  And I

12  think as we get through the various arguments that are

13  presented before the Court today, more reasons will

14  come up as to why this intervention and request for

15  access is inappropriate.

16    But the fundamental issue here is that this

17  is not a public proceeding.  This is a 2004 exam, the

18  purpose of which is to allow the trustee to inquire

19  into the debtor's affairs in a very broad sense.  It's

20  somewhat of a legal fishing expedition, as some of the

21  case law points out.  And because of the broad nature

22  of that exam, there has to be some level of protection

23  to the information that is gleaned from it.

24    Because these documents are not filed with

25  the Court, they are not a matter of public record.

14

```
 1        They are very different from the proceedings that are

 2        cited by the news media in the precedent that they

 3        presented to the Court.

 4               I think I'll kind of stop right there and see

 5        where the Court wants to go with regard to the other

 6        arguments, but I think that's kind of the threshold

 7        that the news media needs to break in order to

 8        intervene in this matter.

 9               Thank you.

10               THE COURT:  Thank you.

11               Mr. Allred, a brief response?

12               MR. ALLRED:  Yes, Your Honor.  I think what

13        both of these arguments do is sort of mesh into one

14        argument, the two arguments.  There is a right to

15        intervene.  I mean, in a Chapter 15, we're talking

16        about an open proceeding.  In these courts, these

17        United States courts, there's a right to intervene.

18        Then whether the intervenor has rights to do things,

19        that's the underlying question that the Court is going

20        to have to decide.

21               It seems to me what both of these arguments

22        do is smush those two things together, so that if you

23        don't have a right to intervene in the underlying

24        matter, you don't have a right to intervene at all.

25        And that simply can't be the law.  The law is -- it
```

```
1      ought to be and it is -- that an intervenor can
2      intervene, and then if the Court decides that, for
3      whatever reason, the intervenor -- when the intervenor
4      makes a motion or asks for some kind of relief that's
5      not going to be granted, then it's not going to be
6      granted, just like it is to any other party in the
7      case.
8              So it seems to me, again, I'd point out that
9      every single case that's been cited in the pleadings
10     from both sides allow the press to intervene.  And so
11     the Court ought not to confuse the right to intervene
12     with the right to the underlying relief that the media
13     is requesting in these matters.
14             THE COURT:  Well, for this morning's
15     purposees, I'm not going to rule right now.  You've
16     heard my preliminary thoughts.  I don't think I've
17     changed on that, but I'm not going to make that as a
18     ruling.  But I do want to go ahead and hear the
19     underlying argument as well.  I'll rule on both of them
20     at the same time.
21             MR. ALLRED:  Well, the Court raised some
22     issues -- before we get into is this an open -- is the
23     2004 exam an open proceeding or not question -- and
24     that is the Court phrased it as whose rule applies in
25     2004 exams.  I assume you're talking about evidentiary
```

16

```
1    rules or the rule of whether it is private or not
2    private.
3              THE COURT:  I was thinking in terms of
4    between -- there was some suggestion in the briefing
5    that, well, the Canadian closed examination rule ought
6    to apply, either because this is really a transplanted
7    Canadian proceeding or through comity.
8              MR. ALLRED:  Right.  And it just seems to me
9    that, first of all, Section I think it's 106 disposes
10   of that issue.  In terms of the comity issue, at least,
11   it says that you cannot change basic policies of this
12   court in a matter of comity to a foreign court.
13             I think the Court would also find -- and I
14   did not have a chance to research this -- but I think
15   you'll also find that in matters of procedure, either
16   under conflict of law rules, matters of procedure don't
17   get adopted as matters of substantive law.
18             And for example, if under U.S. procedure, a
19   certain matter was admissible under the rules of
20   evidence, but under a Canadian procedure it was not, I
21   don't think the fact that this is a Chapter 15
22   proceeding would require that we throw out the rules of
23   evidence in the United States.  I think that assumes
24   way too much.
25             What has happened here is this foreign
```

17

1    representative has elected to take advantage of the

2    powers of this Court and has petitioned this Court so

3    that he may examine the debtor, so that he may,

4    presumably, seize assets that belong to the debtor in

5    the United States, so that he can seek any other kinds

6    of remedies that are appropriate.  And he has -- as the

7    Court knows, under Chapter 15, those remedies are

8    broad.  In fact, the only things he can't do that a

9    trustee can do is with respect to certain avoiding

10   powers and exemption powers.  Other than that, he has a

11   full panoply of powers that a trustee under Chapter 7

12   has.

13            And so the foreign representative has both

14   those powers as to assets located here in the United

15   States.  And so having invoked those powers, he cannot

16   now say --

17            THE COURT:  I understand that some of --

18   there's at least a hint in some of the papers that some

19   of the assets are located in third countries.

20            MR. ALLRED:  Well, but --

21            THE COURT:  And that the examination is

22   related to that.

23            MR. ALLRED:  Yeah.  But certainly, he's

24   examining the debtor here in the United States.  In

25   respect to assets that may be located in third-party

```
 1          countries, I don't know what that means exactly.  But
 2          what it does mean is that he has invoked the powers of
 3          this Court to force this debtor to come in and give
 4          testimony under oath.  The record is replete with
 5          objections and rulings in respect of his claims of
 6          self-incrimination protection under the Fifth Amendment
 7          and others.
 8               So, you know, this has not been -- this has
 9          been a matter in which the Court has been involved on a
10          number of occasions, to the direct benefit of the
11          foreign representative.  Because as I understand it,
12          the Court has ruled that this debtor should answer all
13          those questions truthfully and without invoking any
14          Fifth Amendment privilege rights.
15               THE COURT:  I don't recall that I've actually
16          ruled on that question.  Does that sound familiar to
17          any of the other parties?
18               MS. RILEY:  That's correct.
19               THE COURT:  That I have not?
20               MS. RILEY:  That you have not.
21               THE COURT:  Right.
22               MR. ALLRED:  Well, then I misunderstood.  I
23          beg your pardon.
24               THE COURT:  I understand the Fifth Amendment
25          has been invoked, but nobody has asked me to rule on
```

19

```
 1    what happens afterward.
 2              MR. ALLRED:  I thought when you signed the
 3    order and required him to come in, that that order
 4    required him to answer the questions.  But I may have
 5    misread the order.
 6              THE COURT:  Well, I don't recall that it says
 7    anything about the Fifth Amendment, but I didn't go
 8    back and look at it.
 9              MR. ALLRED:  Okay.
10              MR. LEAVERTON:  I'm sorry, if I could be
11    heard on that, Your Honor?
12              THE COURT:  Sure, Mr. Leaverton.
13              MR. LEAVERTON:  The Fifth Amendment is an
14    issue waiting for the Court to resolve here.  It has
15    been asserted by the debtor.
16              THE COURT:  But there's no motions or
17    anything at this point.
18              MR. LEAVERTON:  That's correct.  But the
19    order that's being referenced that Mr. Allred saw, the
20    Canadian trustee will be taking the position that that
21    order had the effect -- intended effect of ruling on
22    Fifth Amendment issues that had been raised as an
23    objection, and that -- and I believe there's also a
24    stipulated order.  And so there are issues of waiver
25    and prior determination and the rest that I just wanted
```

1     to be sure to make a record that the trustee wants to

2     preserve those issues for the Court.

3          Thank you.

4          THE COURT:  Thank you, Mr. Leaverton.

5          MR. ALLRED:  Okay.  But getting back to the

6     issue of what rule applies, it seems to me that our

7     procedural rules, including the procedural rules -- if

8     our procedural rule is to have an open examination, the

9     fact that the Canadian examination maybe be a closed

10    examination is irrelevant.  This foreign representative

11    has taken advantage of this court and can't change the

12    practices of this court.

13         With regard to comity, that, you know, is --

14         THE COURT:  Just for the benefit of anybody

15    who's listening to a CD of this later and doesn't --

16    isn't familiar with it, this is c-o-m-i-t-y, not

17    c-o-m-e-d-y.

18         MR. ALLRED:  Correct.  With respect to that

19    time-honored principle that substantially antedates

20    Saturday Night Live, we -- the courts are willing to

21    honor requests from other courts, but only to the

22    extent that it doesn't violate some basic public policy

23    of this court.  And if -- and this is an extreme

24    example, but it illustrates it -- if in Canada the rule

25    was that a debtor who didn't answer a question was to

```
 1    be thrown in jail, you know, that doesn't bind this

 2    Court as to what this Court may do with regard to the

 3    debtor.

 4              And if the press is a -- and the cases that

 5    we've cited, in fact, all of the cases in the

 6    pleadings, evidence the fact the press has -- that it

 7    is a fundamental policy of the United States that these

 8    court proceedings be open.  And so this can't be

 9    changed by the fact that it may be a closed proceeding

10    in Canada.

11              Now, to the basic -- the real hard question,

12    and that's the fight over whether or not what has

13    occurred and what will occur in the future, whether

14    it's somehow private discovery or whether it's an open

15    process.  I would say as a preliminary --

16              THE COURT:  I'm reminded of I think it's

17    Cohen's law that the name of the game is the label you

18    succeed in imposing on the facts.

19              MR. ALLRED:  That's correct.

20              THE COURT:  That may very well be true here,

21    that this is a categorization question, and once it's

22    categorized, then we sort of know how it comes out.

23              MR. ALLRED:  Well, I offer tell my young

24    associates in my office that lawyers' jobs are figuring

25    out what bucket things go into.  And once you figure
```

```
1    out what bucket it goes into, then you know what the
2    consequences are.  The hard thing is figuring out what
3    bucket it goes into.
4           Here, though, I think actually what has
5    happened has made this Court's job a lot easier.  And
6    that is that this proceeding was to be an open
7    proceeding and then was closed.  In court document 49,
8    which is a stipulated order entered by the debtor and
9    the foreign representative in these proceedings in
10   which Mr. Thow was required to come and be examined,
11   that order specifically says that it is to occur on
12   Monday, October 29th, 2007 commencing at 9:30 at the
13   bankruptcy court for the Western District of
14   Washington, Seattle.
15          So this was an open proceeding.  And what
16   happened was -- as the Court well knows -- is that the
17   press contacted, I think, chambers.  I think the record
18   reflects that.
19          THE COURT:  I think we noted on the docket
20   that that had happened and that we had advised parties.
21          MR. ALLRED:  And then you advised the
22   parties.  And then they come came up at the point of
23   time for the examination.  And then there was a meeting
24   in chambers.  And I presume in that meeting in chambers
25   the question obviously was asked, well, what do you
```

23

```
 1      litigants want to do with regard to the fact that the

 2      press is here.  Then that came back out on the public

 3      record, and a hearing was held.

 4              And in that -- in that open proceeding, the

 5      parties, Mr. Leaverton on behalf of the foreign

 6      representative and, I believe, both counsel for

 7      Mr. Thow, made their arguments and said that the

 8      matters ought to be closed.  And then this Court closed

 9      it, closed the proceedings.  And after hearing from the

10      press for a short period of time -- there were a few

11      reporters in the room -- and then the Court closed the

12      proceedings.  And the only reason it was closed --

13      otherwise it would have been conducted here -- the only

14      reason it was closed was the fact that the press was

15      here.

16              So what's happened here is that these parties

17      have invoked an open process, and now they can't make

18      it into a private process, if it ever was to be a

19      private process.  We don't think it is.  But if it ever

20      was to be a private process, these parties have invoked

21      this open process.  And now they can't turn around and

22      say, well, we really didn't mean it.  And so as a

23      consequence, this is an open process.

24              And so what happened with the Court closing

25      it down and excluding the press, it is, in effect, like
```

24

```
1        a protective order.  I mean, it has the same effect,

2        that it excludes people from -- in this case, the

3        press, from knowing what went on.

4                And so we think that, under the

5        circumstances, this is different from all the cases

6        cited by the debtor and the foreign representative.  In

7        all those cases, none of them involved a situation

8        where the examination was to occur in court and then

9        was closed down.  And so it makes this case easily

10       distinguishable from all of those cases.

11               THE COURT:  I'm going to need to hear from

12       the other parties, and we've got, as I said, people

13       coming at 10:30.  So I need you to sort of -- you know,

14       I don't know how far into your argument you are, but --

15               MR. ALLRED:  Okay.  Well, I'll try to make it

16       as quickly as I can.

17               Now, this Court, I think you had -- I think

18       it was Judge Overstreet's clerk locate some law for

19       you.  I guess it's the Symington case, I assume, that's

20       being read.

21               THE COURT:  Yes, actually, our legal extern.

22               MR. ALLRED:  Okay.  And the Symington case

23       and the ASTRI cases are those two cases out of Maryland

24       we think are the cases that the Court ought to focus

25       on.  They're the cases which read and study the
```

```
1        background of the open process of examining debtors,
2        whether it appears in its form as a 341 hearing or
3        whether it appears in its form as a 2004 exam of the
4        debtor.  It's the same thing.  The purpose of that is
5        to examine the debtor as to his assets and liabilities
6        and to get basic background information.
7                Nobody disputes that a 341 hearing is open.
8        And here what's going on is you've got the functional
9        equivalent of a 341 hearing in a 2004 exam of the
10       debtor.
11               THE COURT:  Well, one of the things that was
12       really interesting, particularly in Symington, is that
13       it seemed to conflate history under the Bankruptcy Act
14       and then rule 205 with what happened after the
15       enactment of the Bankruptcy Code in 1978 and then,
16       ultimately, rule 2004.  And there was a change, because
17       the statute prior to the amendment of the code did call
18       for it to be conducted in court.  And one of the major
19       and fundamental changes made by the bankruptcy code was
20       to take the judge out of a lot of the processes the
21       judge had taken part in before, like 341 meetings, for
22       instance.  The cases don't address the implications of
23       that, if there are any.
24               MR. ALLRED:  Well, I think the Symington case
25       does talk about that.  And the way the Symington case
```

```
 1     analyzes --

 2              THE COURT:  It just refers to it as if it's a

 3     single unitary history --

 4              MR. ALLRED:  Well, what it refers to is part

 5     of its analysis is whether these kind of examinations

 6     have been historically open.

 7              THE COURT:  Well, and they certainly -- I

 8     think it's probably right that they were prior to the

 9     bankruptcy code.  The question is does Congress

10     changing that part of the law, does that make a

11     difference?

12              MR. ALLRED:  As Symington points out, they

13     didn't say they're closed.  In other words --

14              THE COURT:  No, but they didn't say they were

15     to be here, either.

16              MR. ALLRED:  Pardon me?

17              THE COURT:  They didn't say they were to be

18     here, either.

19              MR. ALLRED:  No, they didn't say they'd be

20     open, but they're silent on the issue.  And so that's

21     the reason the Court went back and looked at it,

22     historically what had happened.  And in 2004 exams,

23     they are not the functional equivalent of discovery

24     between litigants.  The cases are quite clear on that

25     point.  In fact, as the Court knows, you can't use a
```

1    2004 exam -- the discovery obtained in a 2004 exam in a
        2    piece of litigation.  You perhaps might be able to use
        3    it as an admission against interest or to impeach a
        4    witness, but you certainly can't use it as any kind of
        5    substantive evidence like you can deposition testimony
        6    obtained where the parties are in a different context.
        7            And so in that sense, I think this is clearly
        8    an open proceeding.  And I think those cases are the
        9    only ones who have carefully looked at that issue.  The
       10    other cases cited by the foreign representative and the
       11    debtor just assume that -- they assume it's somehow
       12    private discovery.  And it's not that, as the Symington
       13    and the ASTRI cases demonstrate.  These are open
       14    proceedings.
       15            And I also would point out -- and I think we
       16    pointed out in our brief -- that the cases they relied
       17    upon have very specific facts that are different from
       18    what we have here.  For example, in the ASTRI and the
       19    Ionosphere Clubs cases, those examinations were
       20    conducted pursuant to protective orders that shielded
       21    the trade secrets of third parties.  So that kind of
       22    thing is the kind of thing under 107 you don't even
       23    have a right to get.
       24            And in the Enron case, the court was
       25    concerned about a third party involved in litigation

```
1       elsewhere using the 2004 exam in preparation for its
2       own litigation in that third -- in that non-bankruptcy
3       court.
4               And then they finally rely quite a bit on the
5       Seattle Times versus Reinhardt case, which our office
6       litigated, actually.  And in that case, what the
7       Supreme Court said is a litigant in a two-party dispute
8       -- the Times had been sued by Mr. Reinhardt over
9       publication of articles.  And what the Times wanted to
10      do is to use the discovery that it was obtaining to
11      write further stories about the Reinhardt matter.  And
12      the Supreme Court said, no, you can't take private
13      discovery and then turn around and publish it.  That's
14      an improper purpose.
15              But here, this is not -- the press here, the
16      media here in this case, has no particular axe to
17      grind.  They're just trying to get to the truth and
18      trying to serve their public.
19              And I guess, because of the time, the only --
20      the last thing I want to say is it is clear that the
21      burden rests upon the foreign representative and the
22      debtor to specify clear reasons why the press ought to
23      be excluded.  The First Amendment makes that burden
24      quite high.  There has to be some compelling state
25      interest.  And so they have simply not met their
```

29

```
 1    burden, even under a lower standard.  They have some
 2    generalized concerns, but no specifics about what
 3    actually might happen.  The only thing that it seems to
 4    me that even rises to the level of a matter that might
 5    be of some concern is whether third parties in these
 6    other countries might -- the creditors might go and
 7    grab assets down there.
 8             And as the Court knows, Chapter 15 is based
 9    on a U.N. treaty, and those other countries,
10    particularly in Europe and the Caribbean, have all
11    adopted the -- the functional equivalent of Chapter 15.
12    So the foreign representative certainly has the power
13    to go down and to do that.  So the foreign
14    representative has a way of protecting itself in case
15    that ever happened.
16             We're not asking -- the press is not asking
17    for Social Security numbers, bank account numbers,
18    those kinds of things.  We're asking to attend the
19    depositions going forward and to copy the transcript
20    with the appropriate redactions made in those areas.
21    If there are other areas where they want to redact
22    information, then obviously, we'd like to be heard.
23    But on Social Security numbers and bank account numbers
24    and those kind of things, we don't need that.
25             THE COURT:  Well, as of the first of
```

1    December, we're going to have a new rule about

2    redaction of identifying information in court filings

3    that will be in effect, unless Congress does something

4    in the next three weeks.

5            MR. ALLRED:  Oh, so if it's a transcript on a

6    2004 exam, I'm not sure the court reporter would

7    redact --

8            THE COURT:  No, there's a procedure that we

9    have set up under a general order for how to get

10   transcripts redacted before they actually become

11   publicly available.

12           MR. ALLRED:  Well, the point I'm making here

13   is that the press is not asking for that kind of

14   detailed information.  The media here is just simply

15   trying to report a story.  And they have very important

16   interests in reporting that story.  The allegations are

17   that he stole $30 plus million from a lot of people,

18   and they have a right to know about what's going on in

19   these proceedings.

20           Thank you, Your Honor.

21           THE COURT:  Thank you, Mr. Allred.

22           Mr. Leaverton, just a preliminary question.

23   Has the Canadian trustee asked for recognition of -- as

24   a main proceeding in other countries besides the U.S.

25   that you know of?

```
 1                MR. LEAVERTON:  Not that I know of, Your
 2      Honor.  I don't believe so.
 3                THE COURT:  Okay.
 4                MR. LEAVERTON:  I would like to preliminarily
 5      address the Court's question about is this a matter
 6      that requires a ruling right away.  I don't think it
 7      is.  Of course, we worked pretty expeditiously here.
 8      Time was short.  And there's a pretty substantial
 9      record that the Court has, and as the Court noted, some
10      very substantial and interesting and difficult issues
11      to address.  And I understand there's a docket in about
12      10 minutes, and that leaves me roughly five if I give
13      equal time to the debtor.  And I can't possibly --
14                THE COURT:  No, I know you can't.  And we
15      probably won't start the other matter right at 10:30.
16                So Mr. Chen, if you see your fellow
17      litigants, it's going to take me a bit longer with this
18      hearing.
19                MR. LEAVERTON:  I would also note that I
20      think the claim of urgency is a little hollow when you
21      consider the fact that this bankruptcy case in Canada
22      was filed in 2005, the latter part of 2005, more than
23      two years ago, and the events that are in being
24      investigated as newsworthy are of some vintage.  And I
25      don't believe there's any kind of urgency in regard to,
```

32

```
1     you know, the public's interest in knowing some kind of
2     recent event sort of issue.  That just isn't in the
3     record, and I think no one would contend that.
4           As far as the imminence of a continued
5     examination, I think the trustee stated before and will
6     state again, we're not going to proceed with this
7     examination until the Court has had time to really
8     resolve this issue on a thoughtful and deliberate
9     basis.
10          The transcript, it is true, may be issued
11    here at any time.  I believe I have seen a draft of it
12    that has not been reviewed by the debtor.  But I don't
13    think any of this should cause the Court to feel or the
14    parties to feel that we have to rush to make this
15    decision.  Enough said on that topic.
16          And I'd like to -- I think, you know, in
17    terms of the bucket analogy -- and I probably say the
18    same thing to my colleagues.  And we all know law is a
19    system of categories and classifications and rules and
20    the like.  I can there's a third bucket here, Your
21    Honor.  I don't think -- and that really is the reason
22    we're having a difficult time.  Because 2004
23    examinations -- and as Your Honor noted are a product
24    of fairly sweeping amendments to the bankruptcy laws in
25    this country -- really involve a different animal.
```

33

1            And most of the case law, I would submit --
2      other than Symington, which is getting pounded on
3      pretty heavily here by the media as authority -- with
4      that exception, most of the courts are recognizing it
5      to be more akin to discovery.  In fact, if you were
6      putting it on the continuum of a 341 meeting on one
7      extreme, let us say, and a deposition on the other, you
8      would place the 2004 exam clearly on the discovery side
9      of that ledger.  In fact, it would be even further to
10     the extreme, because as we know, discovery is limited
11     by framed issues and relevance and other kinds of
12     considerations.  Those 2004 exams, while they're not
13     total free-for-alls, are much more sweeping in terms of
14     the scope of the examinations that can be taken.
15            So I think it's very important that if we're
16     going to use a bucket analogy, we're really dealing
17     with a different animal here.  And it's probably more
18     like a barrel than a bucket.  It's a very, very big and
19     substantive part of bankruptcy process that we're
20     dealing with here.  And I think this -- the Court's
21     issue that's before it has very, very significant
22     implications for how bankruptcies are conducted in this
23     country and how reliant trustees and other parties in
24     interest are on this tool being private and remaining
25     so.

```
1           I think it's important to consider how we got
2    here.  And some of this I don't think has really been
3    adequately emphasized in the record.  But in November
4    of 2005, the Court entered its order recognizing the
5    foreign main proceeding being the Canadian proceeding.
6    At that time, Your Honor, Mr. Thow had, I believe --
7    I'm trying to remember the order of this -- but at
8    about the same time, he had filed a Chapter 7 in this
9    court.  He came here and sought the application of U.S.
10   bankruptcy law to his situation.  And this court -- it
11   was Judge Overstreet, actually -- entered an order
12   dismissing that case for bad faith filing in view of
13   his voluntary previous filing of the Canadian action.
14           And so I think, you know, it's important to
15   bear that history in mind, that this court has already
16   determined this is a Canadian matter, one that the
17   Canadian court should have the lead on.  And so we're
18   here today, not sitting in the ordinary context of the
19   court's own administration of a bankruptcy estate under
20   one of its more substantive chapters, Chapters 7, 11 or
21   13 or the like.  We're in a very strange animal here.
22   We're in Chapter 12 --
23           THE COURT:  15.
24           MR. LEAVERTON:  I'm sorry.  15.
25           THE COURT:  Animals go with 12.
```

                                                          35

```
 1              MR. LEAVERTON:  Thank you, sorry.  That
 2     order, I think there's some important provisions there.
 3              THE COURT:  This is the order that --
 4              MR. LEAVERTON:  Order recognizing --
 5              THE COURT:  Oh, the recognition order.
 6              MR. LEAVERTON:  Apart from the finding that
 7     this is a foreign main proceeding, which really sets
 8     into play all kinds of substantive provisions of
 9     Chapter 15, the Court also ordered that, "The debtor
10     shall, on reasonable notice, make himself and pertinent
11     records and other documents available for inspection
12     and examination under oath by the Canadian trustee."
13     And it goes -- the order goes further on to state,
14     "Ordered that the debtor shall cooperate with the
15     Canadian trustee with respect to its rights and duties
16     under this order and as the recognized foreign
17     representative with respect to the Thow Canadian
18     bankruptcy case."
19              What that really gets to is -- and what
20     happens in every bankruptcy case, as the Court is
21     aware, where there's a trustee, is there are duties of
22     the debtor to cooperate.  And the kind of information
23     that the Canadian trustee is seeking here in the
24     ordinary case wouldn't even involve a 2004 exam.  It
25     would involve an office visit.  It would involve the
```

```
 1        debtor complying with the statutory requirement to

 2        cooperate with the trustee.

 3             And none of those matters would be of public

 4        record.  And what's happened here, since the -- and

 5        really, that's in the discharge of the trustee's

 6        ordinary duties.  And what happened here was beginning

 7        in November of 2005 -- I think it was December -- I

 8        think the first 2004 exam request was in December of

 9        2006.  In that intervening year, the trustee made all

10        kinds of investigations and has continued to make its

11        investigations.  But this is a very, very long-standing

12        and difficult effort the Canadian trustee has

13        undertaken to get at fundamental financial information

14        and a history of the debtor's financial affairs, which

15        really should be on the threshold of any bankruptcy

16        case without the necessity of court intervention or

17        discovery orders of 2004 exams or any of those things.

18        And that's the context we're in.

19             And the record, I won't go into all the

20        details of the record, but I think the docket here

21        really shows the long difficult effort the trustee has

22        undertaken, the lack of cooperation the debtor has

23        provided in terms of the debtor's duties under law and

24        under the order I just recited from.  And so

25        ultimately, this culminated in an order issued by Judge
```

1    Burnyeat out of the British Columbia Supreme Court.

2              Now, Judge Burnyeat's order -- if I can grab

3    it here -- that's why we're here today is because of

4    Judge Burnyeat's order.  It ended up that the parties

5    were able to stipulate and agree to an order

6    implementing the judge's order.  And that's the order

7    counsel, Mr. Allred, referred to as the stipulated

8    order, recorded order 2004 examination and document

9    production.  And that document has attached to it a

10   number of exhibits, but it includes Judge Burnyeat's

11   order, which is Exhibit B.

12             THE COURT:  This is the order -- stipulated

13   order of June 18th of this year or earlier one?

14             MR. LEAVERTON:  This is actually -- the order

15   I'm referring to now, Your Honor, is October of 2007.

16             MR. ALLRED:  It's docket 49.

17             THE COURT:  All right.  Thank you.  I just

18   don't want to get the wrong stipulated order.

19             MR. LEAVERTON:  Having had such a difficult

20   time with Mr. Thow in getting compliance with this

21   Court's orders and generally getting access to the

22   ordinary information that any trustee would need, the

23   trustee went to the Supreme Court of British Columbia

24   and sought an order to help direct this Court in its

25   efforts to comply with Chapter 15 and help the main

38

1       foreign proceeding.

2           And so in Section 3 of Judge Burnyeat's

3       order, it states that, "Such examination be conducted

4       in the presence of the U.S. court judge or,

5       alternatively, at or nearby the courtroom of the judge

6       presiding over the bankrupt's Chapter 15 case," and

7       here's the important part, "such that the bankrupt may

8       be brought before the judge in person, and the U.S.

9       court can readily enforce this order with appropriate

10      sanctions should the bankrupt fail or refuse," as he

11      had done in the past, "to testify, produce documents or

12      otherwise comply in any respect with this order."

13          And then the order goes on and in Section 4 5

14      states that, "the U.S. court cause or permit a

15      transcript of such examination, together with a copy of

16      all documents produced by the bankrupt, to be provided

17      to the trustee."

18          Now, Mr. Allred, I think in his reply and

19      then this morning, has really been pursuing a kind of

20      quasi-waiver theory, that this order involve the

21      trustee having an examination at the courthouse, sort

22      of like what happened down at King County Superior

23      Court on a supplemental proceeding.  Your Honor may

24      recall, you get a judgment, and the Court will

25      sometimes send you into a conference room with a court

39

1    reporter, and is there basically as an enforcement

2    remedy to get at information.

3         That's really the role that the Court had

4    here under this order, was not to conduct a proceeding

5    or a trial or determine a dispute in the substantive

6    bankruptcy case or determine the interests of -- the

7    pecuniary interests of parties or any of the sorts of

8    things that really trigger these access rights that

9    Mr. Allred is asserting.

10        The only role the Court was to have, and the

11   only reason that the examination was here, was in the

12   event the Fifth Amendment was invoked -- which it has

13   been -- or there were other disputes, to have this

14   court available to respond to those issues.

15        And so I think it is really conflating the

16   situation to contend that there's some sort of -- that

17   this proceeding has changed its character from a 2004

18   exam, or that the press has some sort of special right

19   because the trustee sought -- or Mr. Justice Burnyeat

20   sought to have this court assist him with, really, kind

21   of ending the daisy chain of motions and orders and

22   disregard and the like that have really been --

23   characterized the efforts and which I think are really

24   evidenced in the docket.

25        Now, the issue that Your Honor started with,

40

```
1         which was, I suppose I'll call it the Chapter 15 issue,
2         which is what is the choice of law or the applicable
3         law, to what extent is comity an issue in this case, et
4         cetera.
5              The Canadian trustee would submit that, given
6         the fact that what we're really doing here is an
7         ancillary proceeding to this foreign main proceeding,
8         that the -- I don't think there's any dispute that the
9         Canadian creditors are -- that substantially all of the
10        creditors of the estate are Canadian citizens.  That's
11        why you have Canadian press here and not Seattle press
12        or some other U.S. interest represented.
13             So we have before this Court a proceeding
14        with a limited objective of advancing the Canadian main
15        case to assist the Canadian trustee in examination of a
16        Canadian debtor.  Now, he happens to be a U.S. citizen,
17        I'll grant you.  And I'll get to that in a minute.  But
18        he is a Canadian debtor.  And his case is pending in a
19        Canadian bankruptcy court with a Canadian judge with
20        Canadian creditor representatives and, overwhelmingly,
21        almost all -- I think in candor I have to tell Your
22        Honor, there may be one or two FedEx claims or
23        something from -- that may cross the border, but
24        overwhelmingly, it's a Canadian case.
25             I think that should weigh heavily in the
```

41

```
1      Court's thinking about how the proceeding that the
2      trustee is undertaking here should be regarded.  And
3      really, we'll get to in a minute, I think it's 1506.
4      Mr. Allred referred to 106.  I don't think 106 and
5      sovereign immunity applies.  I quickly looked at the
6      statute, and I don't see anything in there that really
7      addresses this.  I think if you want to go to the code
8      section that would potentially be pertinent, it's 1506.
9              And all that says is that -- and it's sort of
10     of a curb on what is otherwise in 1525.  The Court is
11     instructed, and there's the word "shall," which is
12     pretty unique.  You know, usually courts issue orders
13     and "shall" goes to other people.  But this statute
14     directs the Court with a "shall," which is a fairly
15     unique looking statute from that regard.
16             And it says, This court shall, quote,
17     "cooperate to the maximum extent possible," unquote.
18     That's what 1525 says.  Maximum extent possible with
19     the foreign court and its representative.  So that's a
20     pretty heavy directive.
21             And then the only curb on that is 1506.  And
22     that curb, again, is stated in terms of, I think, a
23     heavy burden.  It says the only time you're not
24     required to do that as a court is if, quote, "the
25     action you were going to take would be" -- I'm sorry --
```

```
 1          "manifestly contrary to the public policy of the United
 2          States," unquote.
 3                  Now, in some ways this is a duel between
 4          Mr. Allred trying to wrap himself up in the flag of
 5          freedom of the press and the First Amendment and me
 6          trying to wrap myself up in the flag of trustee's
 7          rights and the way that the courts function and the
 8          rest.
 9                  But if we were going to talk policy, I think
10          the Canadian nexus that exists with this case, the
11          Canadian law that -- the substantive law that applies
12          here and the reasons for the Canadian government's
13          having enacted such laws and how that's supposed to fit
14          into -- I have to confess, I'm not a real student of
15          Canadian law, and I do have Mr. McLean on the telephone
16          as my co-counsel and a Canadian lawyer.  But the
17          Canadian government had, presumably, pretty good
18          reasons to set up a regime that involves the trustee
19          conducting his examination in private without the right
20          of private parties to be there.
21                  They have different rules, Your Honor, on how
22          they handle discharge or objections to
23          dischargeability.  They have all kinds of nuances in
24          that law that, you know, we could go into but I don't
25          think are directly pertinent.
```

43

```
1              THE COURT:  And it's blessedly short.

2              MR. LEAVERTON:  Right.  But I think it's

3    important to take cognizance of the fact that what's

4    being done here is going to have no real moment in this

5    court.  It's going to have an impact in that court in

6    Canada, and it's going to be used in that proceeding.

7    And it's going to inform the rights -- substantive

8    rights of the parties before that court.  And, you

9    know, I think there's a reference to the term "lis,"

10   that the Canadian courts basically have determined that

11   there's no lis in this sort of a proceeding.  Now my

12   Latin is ancient and long ago, but I assume that means

13   something like dispute or controversy, you know, some

14   claim or controversy that the Court has to determine.

15             Well, the Canadian court has determined that

16   these sorts of proceedings, there is no lis.  If you

17   have no lis, you've got no right to press access, you

18   have no right to other party -- not only that, they

19   draw a tighter circle.  No other parties, really, are

20   permitted to attend.

21             In our case -- I mean, in my experience, 2004

22   exams are very often group examinations.  You'll have

23   other parties in interest who want to sit in.  That

24   will happen from time to time.  In the interests of

25   economy, every bankruptcy lawyer knows that depositions
```

44

1       and discovery are expensive and it's much more

2       efficient if everybody shows up at the same time and

3       asks the same sorts of questions.  And so in my

4       practice, that's very common.  In all the years I've

5       been practicing, I have never seen a press

6       representative at an examination, nor have I ever seen

7       an uninvited member of the public who's not a party in

8       interest sit in on a 2004 examination.

9               So I think with that background, I would just

10      urge the Court that I think the Chapter 15 rubric, I

11      think the injunction of Section 1525 are important

12      considerations in determining the issue here, and that

13      I think they -- I think -- you know, Your Honor asked,

14      are you conducting Mr. Burnyeat's proceeding in the

15      substantive Canadian law?  Or are you conducting under

16      U.S. law and issues of comity?  I would submit to Your

17      Honor, I think maybe that issue doesn't have to get

18      reached.  I think it's a difficult concept to get my

19      mind around, that you're a Canadian judge conducting a

20      Canadian proceeding in U.S. court.

21              But I think comity is really embedded in the

22      Chapter 15 statutes themselves.  And I think the

23      statutes give the Court guidance.  And I think the way

24      it reads to me, we can get kind of caught up in these

25      labels of 2004 exams.  We could have sought an order of

45

1       the Court, a more general order of the Court under
2       Chapter 15 and not refer directly to 2004.  But 2004, I
3       think, is a very broad and malleable tool, and it takes
4       color from the circumstances it's in.  Mr. Allred would
5       have that it's a 341 proceeding.  That's the equivalent
6       of that.  And the Symington court seems to say that.
7       And if I have time, I'll get into that, because I think
8       that's patently wrong.
9                  And in fact, although it's a little bit
10      different, I think the practice is 341 meetings are
11      treated as public meetings.  I think if you look at
12      rule 5001, you look at 341, which as Your Honor noted,
13      the judge is disinvited to attend, I'm not ready to
14      conclude that it is a public proceeding or that there
15      is a right to attend that.  In practice, I don't think
16      parties are excluded.  And very often they're in public
17      forums, like in big cases where people couldn't be
18      effectively excluded.
19                 But there is -- a 341 meeting is a very
20      different animal from a 2004 exam.
21                 THE COURT:  Well, I've got people waiting on
22      the other case.  If this is a good point, let's hear
23      from either Mr. Feinstein or Ms. Riley.  I take it it's
24      Ms. Riley, from earlier argument.  And then I do want
25      to get to the other case, at least by 11:00.

```
 1              MR. LEAVERTON:  All right.  Let me just make
 2      sure I haven't left out anything I really wanted to
 3      make a record on.
 4              THE COURT:  Sure.  No, these are intricate
 5      and involved issues.
 6              MR. LEAVERTON:  I just -- I'd like to close,
 7      and I'll be very brief.  I think there's a lot at stake
 8      here.  And the reason for it is there's a very
 9      interesting and difficult but important distinction
10      between a 341 meeting of creditors, which is not a
11      judicial proceeding.  And there is a -- parties can go
12      in a 341 meeting.  They can ask questions.  They don't
13      have to have lawyers.  And there's a case, In Re
14      Maloney, 249 Bankruptcy Reporter 71, that ruled on -- I
15      think there was someone contending that a creditor
16      asking questions was practicing law on an unauthorized
17      basis.  And the Court made an interesting statement.
18      It said that it's not an appearance before a public
19      tribunal and that, therefore, it doesn't invoke the
20      issues regarding the practice of law.
21              So a 341 meeting is this first meeting.
22      Creditors are invited, and they get to ask questions.
23      The trustee's there.  The U.S. Trustee's Office, as you
24      know, typically asks some questions.  That's a
25      different sort of proceeding.  And if we were debating
```

47

```
1          that today, it would be a different sort of an inquiry.

2                    The 2004 exam conducted by a trustee, which

3          is what's going on here, or by any other party in

4          interest, is a totally different animal.  And it is, I

5          think, critically important to the bankruptcy process

6          that it can be conducted in a private fashion.

7                    Now, if the parties elect to submit something

8          into the Court record, that's when Mr. Allred's

9          clients' rights get triggered.  But when the trustee is

10         just setting about investigating the affairs of the

11         debtor, or a creditors committee doing it, to have the

12         Victoria television station as partner in the room

13         while this investigation is being undertaken is an

14         absolutely ruinous approach to bankruptcy

15         administration.  And I think it will have severe and

16         far-reaching consequences if the Court were to go down

17         that road.

18                    Fundamentally, the trustee here wants to do

19         his job.  The creditors who are, as a body, represented

20         by the inspectors -- and I did want to note on the

21         record, I think there's an error in Mr. Cheever's

22         declaration.  There are four inspectors, not five.  He

23         wanted me to make that point.

24                    THE COURT:  Right.

25                    MR. LEAVERTON:  But he does not want to
```

48

```
 1      become Geraldo Rivera.  He's not an investigative
 2      reporter.  He doesn't want to be the cub reporter for
 3      the newspapers of Victoria.  He doesn't want the
 4      newspapers of Victoria assisting him in doing his
 5      investigation.  He thinks he knows how to conduct that
 6      and how to do that.
 7              As I say, and as I stated I guess, when I
 8      first addressed the Court this morning, the press
 9      really does, in relation to a 2004 exam -- which is not
10      of record in the court -- stand in the relation of the
11      general public.  They don't have any greater rights
12      than one of my colleagues standing here -- that's not a
13      good example -- but some disinterested third-party
14      individual wanting to come in and sit in here because
15      they're interested in the situation.
16              So I have more that I would add, but I think
17      the main points have been covered, Your Honor.
18              THE COURT:  Thank you.  Ms. Riley?
19              MS. RILEY:  Thank you, Your Honor.  I will be
20      brief, not only in the interests of time, but as a
21      criminal defense lawyer, there's only so much
22      bankruptcy law I would cram into my brain in one week.
23      And so for that reason alone, I would like to reserve a
24      couple of moments for Mr. Feinstein to address the
25      Court.
```

1        I think Mr. Leaverton addressed many of the
2   concerns that the Court had with regards to deference
3   to the Canadian trustee and what rules apply, whether
4   it's Canadian or American.  So I'm not going to go into
5   that this morning.  I think the Court has enough
6   information before it from the standpoint of briefing
7   and argument.
8        However, I do think it is important for the
9   debtor to respond to the primary issue in this case in
10  this matter.  And that is whether or not this is a
11  standard discovery proceeding or whether or not this is
12  a public court proceeding where the press is presumed
13  to have public access.  And we would argue to the Court
14  that that is not the case.  This is not a public
15  proceeding.
16       THE COURT:  And the presumption, if it's
17  discovery, is that it's not -- unless and until
18  something is filed in the court, it's not open.
19       MS. RILEY:  Filed with the court or on the
20  court's record, correct.
21       The news media pointed to the stipulated
22  order that was entered in this case bringing my client
23  to this courtroom for the deposition last Monday.  And
24  I think what needs to be clarified -- and I think
25  Mr. Leaverton made a good record on this issue -- is

50

1      this has been a contentious proceeding.  It has gone on
2      for a number of months.
3              And this was the best way to get Mr. Thow
4      into court to respond to questions and have a judge
5      available if issues such as the Fifth Amendment arose
6      that needed to be resolved immediately.  That is the
7      reason why we were in this courthouse, not because this
8      was a public proceeding, per se, but to have the Court
9      available if need be.  We were in a conference room.
10     It could have just as easily been a conference room
11     next door.  The fact that we're in this courthouse has
12     no bearing on whether or not it was a public
13     proceeding.  So I'd argue to the Court that that was
14     not the case, as contended by the media.
15             In addition, as Mr. Leaverton pointed out in
16     his brief, the news media is not a party in interest to
17     this 2004 examination.  Much of the case law that has
18     been cited by the news media revolves around public
19     access being given to other parties in interest to the
20     proceeding.  The news media is not a party in this
21     matter.  And I think that is a clear point that needs
22     to be addressed.
23             The whole idea of media access to the
24     examination contradicts the purpose of a rule 2004
25     examination, at least from what I have gleaned from the

1       case law.  The purpose of the rule is to allow for a

2       broad examination and inntrospection into a debtor's

3       finances.  This means that there may be information

4       that comes out of the examination that's completely

5       irrelevant, goes beyond the scope of a court

6       proceeding.  And for that very reason, it is allowed to

7       be somewhat of a fishing expedition, as I mentioned

8       earlier.  Very different from a court proceeding or

9       other public hearing where a witness is placed under

10      oath on a court record.

11          There are a number of reasons that have been

12      articulated in the briefing, not only by myself, but by

13      Mr. Leaverton, as to why the media should not be

14      permitted access into this proceeding and in future

15      2004 proceedings, and that's to preserve the integrity

16      of the examination.  My client wishes to cooperate to

17      the extent that he can.  And in order to do that, he

18      needs to be able to be in a forum where he can provide

19      information to the trustee to satisfy the trustee's

20      inquiries and to prevent undue and unnecessary

21      disclosure of either superfluous information or

22      personal information that may be detrimental to him in

23      the long run.

24          We have a number of creditors in Canada who

25      are paying very close attention to this bankruptcy

```
 1        bankruptcy proceeding, which is somewhat unusual.  They
 2        are very involved, and they are wanting to know
 3        everything that is going on about this.  My client has
 4        received --
 5                THE COURT:  You're saying this bankruptcy
 6        proceeding meaning the Canadian proceeding?
 7                MS. RILEY:  The Canadian proceeding, sorry.
 8        My client has received threats.  You know, it's really
 9        gone beyond any sort of a traditional bankruptcy
10        proceeding.  And that is because of the close attention
11        that the media and the Canadian creditors have paid to
12        it.  Because of that, the concern of the media getting
13        involved creates a huge concern, from the standpoint of
14        my client, that this could spiral out of control.
15                Mr. Leaverton also pointed out very
16        articulately that the Canadian trustee has very
17        different and also very legitimate concerns about other
18        third-party creditors getting involved.  There is good
19        cause that has been shown to keep the media out of this
20        examination.
21                I think it's also important to point out that
22        a lot of the cases that have been cited in this motion
23        have involved situations where the Court has issued a
24        protective order.  This is not a situation where there
25        is a protective order in place.  And that is because of
```

1      the way the proceedings took place on Monday.  It was

2      not a proceeding where we needed a protective order

3      because it wasn't a public proceeding, per se.

4            I think I've, for the most part, summed up

5      the pertinent parts of my argument.  Obviously, there

6      are more contained within my briefing.  I know

7      Mr. Leaverton's touched on all the other issues that

8      the Court wished to have addressed.  And I believe

9      Mr. Feinstein would like to address the Court on a

10     couple of other more specific matters that,

11     unfortunately, I can't address because of my minimal

12     level of expertise.

13            Thank you.

14            THE COURT:  Mr. Feinstein?

15            MR. FEINSTEIN:  Judge Zilly, I think,

16     answered our -- one of the questions this morning at

17     our bankruptcy breakfast when he said the bankruptcy

18     rules are just rules.  They're just procedural rules of

19     how you do things, what you do, what kind of forms you

20     file, what kind of papers.  They're procedural rules.

21     They don't affect the substantive rights.

22            For instance, in Chapter -- when the Court

23     issues a ruling and an order under bankruptcy rule

24     2004, that's just a procedural rule that says that as a

25     procedure, when somebody wants to take an examination

                                                          54

```
 1        of somebody else -- it doesn't have to be the debtor;

 2        any party can take an examination of another party --

 3        there's a procedure to do that.  You can go to the

 4        Court, you can file a motion, and the Court can issue

 5        an order compelling.  Those are procedural rules.  As

 6        Judge Zilly says, those don't affect substantive

 7        rights.

 8                Now, you go back to the substantive rights of

 9        the code to see what the substantive rights are.  There

10        is no 341 meeting of a debtor in a Chapter 15.  Chapter

11        341 -- or Section 341 does not apply to debtors in

12        Chapter 15.  341 is defined, in fact, as a debtor who

13        is a debtor for a petition for relief under Section

14        301, which is a debtor under a Chapter 7, 11 and 13.

15        So Chapter 15 debtors, even though it's a defined term

16        in Chapter 15, the debtor is defined as the entity

17        subject to the foreign proceeding.  He's not a debtor

18        under Section 341 or Section 301 that's required to

19        appear for that kind of examination.

20                THE COURT:  But presumably, if there had been

21        no examination at all in Canada --

22                MR. FEINSTEIN:  Take a look at Section

23        1521 --

24                THE COURT:  But let me finish the question.

25        Presumably, if there had been no Section 341 equivalent
```

                                                             55

```
1          -- it doesn't have to be Canada, any foreign proceeding
2          -- and that the foreign law provides for such an
3          initial debtor examination, presumably under Chapter
4          15, once recognition is granted, the U.S. court could
5          order that kind of examination here.
6                    MR. FEINSTEIN:  The Court can order that type
7          of examination as a procedure under 204, because those
8          are procedural rules.
9                    THE COURT:  Or essentially, under not even
10         2004.  341, all comers kind of meeting of creditors
11         would presumably be something a court could order on a
12         case-by-case basis, once recognition is granted --
13                    MR. FEINSTEIN:  Certainly.  We're not
14         challenging that you ordered him to appear and he did
15         appear or we're not going to appear.  The substantive
16         provisions of Chapter 15 are the 1521 procedures.  And
17         none of those 1521 procedures require a debtor to
18         appear for an examination.  The trustee can take
19         possession of assets, lawsuits can be stayed, assets
20         can be protected, sold.  There is nothing under the
21         1521 rules like Section 341.  And 341 only applies,
22         like I said --
23                    THE COURT:  I understand that part of the
24         argument.
25                    MR. FEINSTEIN:  Under 301.  So the argument
```

56

1 here is that just because there was an examination

2 under 2004 creates a public proceeding.  2004, like

3 Judge Zilly said, is just a procedural rule.  It's just

4 how you do things.  So the trustee can come down and

5 use that rule and ask this Court in furtherance of the

6 Chapter 15 procedures, to ask the debtor to appear and

7 testify in an examination.  But it's not necessarily a

8 public proceeding.  It's not a proceeding, like the

9 argument earlier on 341, because there is no 341 in

10 Chapter 15's.  So they're just trying to codify that

11 when the Court issues rules under 2004, those are just

12 procedural rules to accomplish what the trustee's

13 asking the Court under Chapter 15.  So it's does not

14 necessarily creates a public procedure.

15 THE COURT:  Thank you.  Just for clarity in

16 the record, Mr. Feinstein alluded to remarks by Judge

17 Zilly.  That was at a breakfast meeting of the

18 bankruptcy section of the Federal Bar Association this

19 morning here in Seattle.  And Judge Zilly has just

20 completed a term as the chair of the advisory committee

21 on bankruptcy rules of the judicial conference of the

22 U.S., and was just sort of recounting his history and

23 where it fits into the process.  Roughly 100 folks were

24 there.  I was there, Mr. Feinstein was there.  Lots of

25 other folks were there.

```
 1            Mr. Allred, brief response?

 2            Let me tell you what I'm planning to do after

 3      this.  I'm planning to take a recess.  We'll talk very

 4      briefly, after Mr. Allred concludes, on when we

 5      reconvene.  I'll have to take a very short recess

 6      before I come back for the Chen matters, but that

 7      shouldn't be more than about five minutes.

 8            So Mr. Allred?

 9            MR. ALLRED:  Thank you, Your Honor.  I will

10      be brief.

11            In the order which Mr. Leaverton cited that

12      the Canadian court issued, it says --

13            THE COURT:  I have it on the screen as well.

14      It's attached to docket No. 49.

15            MR. ALLRED:  Oh, here it is.  Yeah, it's

16      docket 49.  If you go to the order, it says -- and in

17      paragraph 3, it says, "that such examination be

18      conducted in the presence of the U.S. court judge or,

19      alternatively, in a nearby courtroom for the judge of

20      the U.S. court."  So it was intended to be a proceeding

21      where this court was actively and affirmatively

22      involved in the process.  And that's what occurred.

23            When the parties came here, there was an open

24      proceeding.  And my -- we had the transcript run, and

25      as best I can read it, which isn't very good because of
```

58

```
 1          the quality of the reporting, but this court said --

 2                    THE COURT:  This is of the hearing?

 3                    MR. ALLRED:  The hearing on the 29th.

 4                    THE COURT:  There's no transcript on file at

 5          this point.

 6                    MR. ALLRED:  Right.  I'm just reading from

 7          what I have, and this may or may not --

 8                    THE COURT:  So I take it that's a transcript

 9          somebody in your office did from the CD.

10                    MR. ALLRED:  Yeah, we ordered a copy of the

11          recording and made, as best we can, a copy of the

12          transcript.  But basically, you said, "My instinct is

13          that there is not a significant prejudice in allowing

14          the examination to go forward today on a closed basis.

15          If various press representatives or your organizations

16          want to move to intervene and seek a transcript, a

17          notice of motion to that effect would be appropriate."

18                    And so it was intended to be an open

19          proceeding, and it would have been an open proceeding

20          but for the fact that the press was there.  And so it

21          seems to me that that is a fundamental distinction that

22          this Court needs to keep in mind when it makes its

23          ruling.

24                    THE COURT:  Well, I should say it's not at

25          all clear to me that -- you mean open proceeding
```

59

```
1      meaning in the courtroom.  It's not at all clear to me,
2      had there been no press interest and no issues,
3      contentious issues arising in the examination, that I
4      would have had anything at all to do with it.  I think
5      it was not going to be in the courtroom precisely
6      because the recording system is always on in here.  It
7      was going to be in a conference room.  That was
8      certainly my expectation beforehand.
9              MR. ALLRED:  Well, the order says it's to be
10     here at the courthouse.
11             THE COURT:  Well, the courthouse, yes.
12             MR. ALLRED:  This is fundamentally different
13     than having something done at some lawyer's office,
14     which is where 2004 exams usually occur.
15             And then with this issue of comity, and what
16     the nature of Chapter 15 is, the point is -- and I come
17     back to this and I just reemphasize this court -- that
18     they've invoked the powers of this court to do a lot of
19     things.  And that includes if they invoke those powers,
20     then under those circumstances, our procedures with
21     respect to the press are applicable.  The cases make
22     quite clear that the press is entitled to be in these
23     kind of proceedings.
24             So we would urge the Court to so rule, at
25     least under these circumstances.  If the Court wished
```

60

```
 1        to distinguish this from general 2004 proceedings, it

 2        has a basis in doing that, given the fact that they've

 3        invoked the Court in coming up here to the courthouse.

 4                THE COURT:  Let me tell you what I'm -- just

 5        in terms of timing.  There are really two possibilities

 6        -- three.  I am not certain that I'm going to do a

 7        written decision.  But there are some really important

 8        issues here, and I find that it sometimes helps me to

 9        sort them out to do a written decision.  If I do a

10        written decision, that will take some time.

11                My instinct right now is simply to say I'd

12        like to reconvene this hearing to mid afternoon, say

13        3:00 or something like that.  I may have a ruling at

14        that point.  We could do it tomorrow morning and have

15        it to the same -- have the same kind of session then,

16        if that's better for people's schedules.  Or I may say

17        I'm going to take it under advisement and do a written

18        decision.  I just don't know at this point.  But I need

19        some time to think through that, and I can let you

20        know, as I say, either this afternoon, tomorrow

21        morning.  I'd prefer not to do it tomorrow afternoon,

22        but it could be the afternoon if that's necessary for

23        the parties.

24                So I would suggest -- my first sort of

25        suggestion would be to say 3:00 this afternoon.
```

```
 1              MR. ALLRED:  Your Honor, would that be to do
 2      further argument or just to get your ruling?
 3              THE COURT:  To get -- I might ask -- it's
 4      possible I would ask something further.  But I think
 5      what I have in mind is just either to give a ruling or
 6      to say this is where I think I am, and here's how long
 7      I think it's going to take to get you a ruling.  But I
 8      don't know for sure which it would be at this point.
 9              MR. ALLRED:  The reason I ask that is because
10      all of us have hauled up quite a bit of paperwork.  If
11      we have to stick it somewhere --
12              THE COURT:  It can certainly be -- the
13      courtroom will be secure when we're not in session, so
14      that's not a problem if you'd like to do that.
15              MS. RILEY:  Your Honor, I would just like to
16      interject.  I do have a scheduling conflict.  I have to
17      be on a plane this afternoon at 3:00.  So I will be out
18      of the state this afternoon and tomorrow.  If the Court
19      is just inclined to give a ruling and not ask for
20      additional argument, then I'm certain that you can
21      proceed without me.  Mr. Feinstein has indicated that
22      he's not available this afternoon, but is available
23      tomorrow morning.
24              MR. FEINSTEIN:  I can do it tomorrow morning.
25      I've got a 9:30 court hearing just next door -- no,
```

62

```
1    downstairs, but I can be here at 10:00 or 10:30

2    tomorrow morning.

3              THE COURT:  What about 9:00 tomorrow morning?

4    I don't know if others have -- how does that -- you

5    will be gone in any event, Ms. Riley?

6              MS. RILEY:  I will be gone in any event.  I

7    guess my point was if the Court wants additional

8    argument, I'd prefer it be set over till Monday.

9              THE COURT:  I'll be gone Monday is part of

10   the problem.  Or I'll be gone next week is part of the

11   problem.  But if I'm writing, that's not a problem.  I

12   mean, I would still be working on it.

13             Mr. Allred, does this afternoon or tomorrow

14   morning make any difference to you?

15             MR. ALLRED:  Either of those dates are fine,

16   Your Honor.

17             MR. LEAVERTON:  Same with me, Your Honor.

18             THE COURT:  I think I would prefer to do it

19   first thing in the morning.  Well, no, let's just do it

20   at 3:00.  I'll let you know how I'm going to proceed.

21   Sorry to be so indecisive, but I think 3:00 would make

22   the most sense.

23             MR. LEAVERTON:  Could I ask, Your Honor, the

24   trustee, like the voice of God, could maybe tell us on

25   the phone -- Mike and John, are you available this
```

63

```
 1    afternoon?

 2              UNIDENTIFIED SPEAKER:  Yes.

 3              MR. LEAVERTON:  Okay.

 4              THE COURT:  All right.  So 3:00 it is.  And

 5    we'll take a brief recess and then come back for what

 6    was the 10:30 matter.

 7              (This matter was adjourned until 3:00.)

 8

 9                      * * * * * * * * *

10

11              THE COURT:  I've pondered this somewhat in

12    the interval.  And I've reached the conclusion that I

13    really should do a written opinion.  The issues are

14    quite complex, and I think that it helps me to sort out

15    how they fit together and what the result ought to be,

16    to go through the writing exercise.  And so

17    accordingly, I'm going to endeavor to do that.  But to

18    make sure that it gets done in a relatively timely

19    fashion, I'm going to set a further hearing, at which

20    time I'll give you a ruling if I haven't already done

21    it in writing.

22              What I would propose is the 29th of November,

23    which is a Thursday.  The Thursday before is

24    Thanksgiving, I believe.  And at 10:30.  Does that time

25    present a problem for anyone that you know of?  I take
```

```
 1      it we don't know Ms. Riley's schedule.

 2              Well, let's do this.  If it does present a

 3      problem, let chambers know and we'll sort something out

 4      in that week.  I've got hearings in Tacoma on Tuesday

 5      for sure, and Friday I may not be able to use at all.

 6      I may have to be out of town.  So it could be later in

 7      the day on Thursday, or it could be earlier in the week

 8      probably.  Or it could be into the following week.  But

 9      I know counsel and everybody wants a relatively prompt

10      response.

11              MR. LEAVERTON:  Oh, I see.  Thanksgiving is

12      the week earlier.

13              THE COURT:  Right, yes.  Otherwise I would be

14      shooting for that date.

15              MR. ALLRED:  Your Honor, from my perspective,

16      that's fine.

17              THE COURT:  All right.  Thank you.  Anything

18      else we need to do today?

19              MR. LEAVERTON:  Nothing from the trustee,

20      Your Honor.

21              THE COURT:  Okay.  Oh, Mr. Allred, would you

22      submit an order that grants the motion to intervene?

23              MR. ALLRED:  Yes, I will.

24              THE COURT:  Okay.  Thank you.

25                      * * * * * * *
```

65

```
 1                        CERTIFICATE

 2

 3                ROBYN OLESON FIEDLER certifies that:

 4

 5                The foregoing pages represent an accurate and

 6       complete transcript of the entire record of the

 7       digitally-recorded proceedings before the HONORABLE

 8       PHILIP H. BRANDT presiding, in the matter of THOW; and

 9

10                These pages constitute the original or a true

11       copy of the original transcript of the proceedings.

12

13                Signed and dated this 19th day of November,

14       2007.

15

16

17                        AHEARN & ASSOCIATES

18

19

20                by |s| Robyn Oleson Fiedler
                     ROBYN OLESON FIEDLER, Notary
21                   Public in and for the State of
                     Washington, residing at Buckley.
22

23

24

25
```

66