<pre>
1              UNITED STATES BANKRUPTCY COURT

2              WESTERN DISTRICT OF WASHINGTON

3                       AT SEATTLE

4    _____

5    In re:                    )
                               )
6    IAN GREGORY THOW,         )         No. 05-30432
                               )
7              Debtor.         )
                               )
8    _____

9      TRANSCRIPT OF THE DIGITALLY-RECORDED PROCEEDINGS

10        BEFORE THE HONORABLE PHILIP H. BRANDT

11                   OCTOBER 29, 2007
     _____
12

13

14

15

16

17

18

19

20

21

22

23    Reported by:  Robyn Oleson Fiedler
                    CSR #1931
24

25
</pre>

```
1                       A P P E A R A N C E S

2

3            For the Debtor:

4                        MR. LARRY B. FEINSTEIN
                         Attorney at Law
5                        VORTMAN & FEINSTEIN
                         500 Union Street, Suite 500
6                        Seattle, WA 98101

7
             For the Canadian Trustee:
8
                         MR. BRUCE W. LEAVERTON
9                        Attorney at Law
                         LANE POWELL
10                       1420 Fifth Avenue, #4100
                         Seattle, WA 98101
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              DIGITALLY RECORDED IN SEATTLE, WASHINGTON
 2                        OCTOBER 25, 2007
 3                          --ooOoo--
 4
 5              MR. LEAVERTON:  Bruce Leaverton representing
 6      Wolrige Mahon, the trustee in the matter.  Mr. Mike
 7      Cheevers is the representative of --
 8              THE COURT:  Okay.  Thank you.
 9              MR. McLEAN:  Your Honor, John McLean, I'm
10      Canadian counsel for Mr. Cheevers.
11              MR. FOX:  Your Honor, Greg Fox of Lane
12      Powell.
13              MR. FEINSTEIN:  Larry Feinstein, attorney for
14      the debtor.
15              MS. RILEY:  Jessica Riley, I represent
16      Mr. Thow pertaining to the criminal matters.
17              THE COURT:  Okay.  Thank you.  I should also
18      mention that Matt Johnson is also present.  He is a law
19      student at Seattle University and is working with Judge
20      Overstreet as an extern and has done some research on
21      these issues as well.
22              Are there press representatives present in
23      the courtroom?  Could I ask you each to identify -- why
24      don't you come forward to the podium, because these
25      proceedings are recorded digitally.
```

```
 1                    MS. ARMSTRONG:  Okay.  I'm Courtney
 2         Armstrong, and I'm with CBC News, television news out
 3         of Vancouver.
 4                    THE COURT:  Thank you, Ms. Armstrong.
 5                    MS. CROSBY:  Jennifer Crosby, CHEK TV News
 6         from Victoria on Vancouver Island.  And Kendall Hansen,
 7         my photographer, is here as well.
 8                    THE COURT:  I take it his camera is somewhere
 9         else?
10                    MS. CROSBY:  Yes, it is.
11                    THE COURT:  Okay.  Thank you.  Oh, sir?
12                    MR. DUFFY:  My name is Andrew Duffy.  I'm
13         with the Times Colonist Newspaper in Victoria.
14                    THE COURT:  Okay.  Thank you, Mr. Duffy.
15                    All right.  These are -- well, I take it -- I
16         should also say, when we first received inquiry in
17         chambers on Thursday regarding press attendance at this
18         examination, we did advise counsel for the parties, the
19         interested parties, the parties who were of record in
20         the proceeding on this side of the border, so this was
21         not a complete surprise to them.  It might not have
22         been anyway.
23                    The other thing that I want to put on record
24         is I've just briefly had a conference in chambers with
25         the counsel who identified themselves on the record a
```

4

```
1        few minutes ago, just talking about where we are and
2        what would happen next.  And I think what happens next
3        is I'd like each of the parties to indicate on the
4        record both the trustee's position and Mr. Thow's
5        position, and then we'll talk about what we do next.
6                MR. LEAVERTON:  Thank you, Your Honor, Bruce
7        Leaverton on behalf of the trustee.  The trustee
8        believes that it's in the best interests of the
9        bankruptcy estate in Canada that's being administered
10       that the examination proceed this morning on a private
11       basis and without the press attending it for a variety
12       of reasons, including concerns regarding being able to
13       make that investigation and examination as effective as
14       possible.  And the trustee believes that at this stage
15       in his examination, that the examination should proceed
16       on a private basis.  Thank you.
17                THE COURT:  Mr. Feinstein?
18                MR. FEINSTEIN:  Larry Feinstein, attorney for
19       the debtor.  The debtor also would request that the
20       proceedings remain sealed or that the press not be
21       invited.  This is an ancillary proceeding, but it's
22       still given under bankruptcy rule 2004, which means
23       that the trustee may question the debtor regarding his
24       financial affairs, where he banks, what his bank
25       records are, what his account numbers are, what kind of
```

5

```
 1       credit cards does he have, what card numbers, where
 2       does he live, where does he work.  And those are all
 3       kinds of things that, because of the nature of this
 4       proceeding, the third parties -- not necessarily the
 5       press, but third parties could utilize that would not
 6       be to the benefit of the debtor, the estate or the
 7       trustee.  So we're requesting that they be excluded.
 8            We're also going to reserve the right, if the
 9       Court does allow the press to make a motion to
10       intervene at a subsequent point in time and obtain a
11       transcript, that we would be asked the right to be able
12       to go through and redact things that give out personal
13       information like that as well.  So it's not before the
14       Court today, but we're asking that we're going to keep
15       that, you know, as part of our proceeding.
16            THE COURT:  Well, let me say to the press --
17       well, I guess I should ask the various press
18       representatives, Ms. Armstrong, Ms. Crosby -- Cross or
19       Crosby?
20            MS. CROSBY:  Crosby.
21            THE COURT:  Sorry -- and Mr. Duffy, do you
22       see any -- is there any prejudice to allowing the
23       examination to go forward on a closed basis with the
24       possibility that you might obtain a transcript later,
25       perhaps less account numbers and precise addresses?
```

6

```
 1                MS. ARMSTRONG:  That would be fine.  I mean,
 2        I'd like to have a copy of the transcript.
 3                THE COURT:  That's Ms. Crosby.  And you're
 4        with CHEK --
 5                MS. ARMSTRONG:  No, sorry, I'm Ms. Armstrong.
 6                THE COURT:  I'm sorry, I got you reversed.
 7                MS. ARMSTRONG:  We're right beside each
 8        other.
 9                MS. CROSBY:  I'm Ms. Crosby, and I'm with
10        CHEK News.  Personally, we'd prefer to be in the
11        proceeding if we can.  A transcript doesn't necessarily
12        give the full indication of what's going on.  This is a
13        case of some great public interest.
14                THE COURT:  Yeah, I'm aware -- when this
15        surfaced Thursday, it took me about two minutes on the
16        internet to see why there might be substantial public
17        interest, particularly on the Canadian side of the
18        border.
19                MS. CROSBY:  And of course, we'd be -- you
20        know, we have no interest in publishing Mr. Thow's bank
21        numbers, bank account numbers or anything like that.
22                THE COURT:  Mr. Duffy, anything different
23        from your perspective?
24                MR. DUFFY:  Well, I absolutely agree with
25        Ms. Crosby, we'd prefer to be there and get the tenor
```

7

```
1        of the examination, obviously.  And we have absolutely
2        no problem not publishing personal information, credit
3        card numbers and that kind of thing.
4               THE COURT:  Counsel have anything further to
5        say on the subject?
6               MR. FEINSTEIN:  Just the problem, of course,
7        I pointed out to the Court in chambers, is the
8        enforcement provision of your agreement to publish.
9        The Court doesn't have contempt proceedings in Canada.
10       So if you violate it, there's nothing we can do to
11       unring the bell.  So we'll put that in the record.
12              THE COURT:  Mr. Leaverton, anything further?
13              MR. LEAVERTON:  No, Your Honor.
14              THE COURT:  Okay.  Well, I think in the
15       circumstances, I know it has taken some time to
16       organize this proceeding.  If you look at the docket,
17       there have been motions going back several months now.
18       My instinct is that there is not a significant
19       prejudice in allowing the examination to go forward on
20       a closed basis today.  If the various press
21       representatives or your organizations want to move to
22       intervene and then seek a transcript, a noticed motion
23       to that effect would be appropriate.
24              I would point out to all parties, a good -- a
25       very useful case for starting the analysis is In Re
```

8

```
1      Symington.  It's S-y-m-i-n-g-t-o-n.  And the citation
2      is 209 Bankruptcy Reporter 678.  It's a bankruptcy
3      court case from Maryland in 1997.  But although it's
4      from Maryland, it relates to the then pending
5      bankruptcy of the governor of Arizona who was also
6      under indictment for bankruptcy fraud at the time.  And
7      it was related to an examination of, it turned out to
8      be not the debtor's mother, but her personal
9      representative because she had died between the
10     issuance of the subpoena and the date of the opinion
11     that I've just referenced.
12            But it has a great deal of the history and
13     background of 2004 examinations and how they relate to
14     civil discovery and how they might differ from civil
15     discovery.  I'm agnostic on that point on whether or
16     not that's the right answer.  There are contrary
17     decisions, and so that's exactly why I didn't want to
18     make a final decision today.
19            So if any of the press wants to move to
20     intervene and wants to seek -- wants to make a motion
21     to have the transcript, I'll consider that in the
22     normal course of things.
23            I would point out that, although I don't -- I
24     assume that all of your organizations know that in
25     federal courts in the United States, corporate entities
```

9

```
 1    need to be represented by counsel.  So I assume that
 2    that's not a major hurdle for any of your
 3    organizations.
 4              So is there anything further we should do at
 5    this point?
 6              MR. LEAVERTON:  Nothing from the trustee,
 7    Your Honor.
 8              THE COURT:  All right.  So I guess proceed
 9    with the examination, and if difficulties arise, we can
10    have the appropriate hearing.
11              MR. LEAVERTON:  Thank you.
12              (Court was recessed.)
13
14              THE COURT:  Well, good afternoon.  We're here
15    again on the Thow matter.  Mr. Leaverton is there.
16              MR. LEAVERTON:  Bruce Leaverton representing
17    the Canadian trustee, Your Honor.  We have gone as far
18    as we can go.  We have two matters to resolve before we
19    can complete the examination.  One is the -- in
20    particular, the bank documents that were subject of the
21    stipulated order which attaches a subpoena and
22    describes a number of documents that Mr. Thow was to
23    provide us.  We have some but not all of those records.
24              In particular, we have, for example, Wells
25    Fargo bank account records that don't include the
```

10

```
 1      calendar year 2007.  They stop at 2006.  He has bank

 2      accounts with two or three other institutions where he

 3      provided the records that he could get off-line, you

 4      know, on the internet, which is approximately a

 5      six-month period.

 6              THE COURT:  So recent but not historical.

 7              MR. LEAVERTON:  Correct.  And I believe the

 8      trustee would prefer to proceed by way of subpoena

 9      against those institutions that are now disclosed as

10      places where he has bank accounts.  And so we'd like to

11      resume the examination once we obtain those materials.

12              The other matter that's coming before us as

13      an obstacle is the Fifth Amendment has been asserted by

14      Mr. Thow's criminal counsel in response to a number of

15      inquiries.  The parties have a dispute regarding the

16      vitality of the privilege in view of the two bankruptcy

17      filings, the sworn materials submitted in those

18      bankruptcy filings, Mr. Thow's prior stipulations and

19      responses to written questions and his testimony today

20      and other factors.

21              So the situation is that the trustee is

22      content with not -- not trying to resolve that matter

23      here and now today, those Fifth Amendment issues.  But

24      the objection has been interposed, and the witness has

25      been instructed not to answer, and we don't have
```

11

1          answers to those questions.  So we would propose that
         2          we would -- I suppose the proper procedure would be a
         3          motion to compel responses to those questions that
         4          are --
         5               THE COURT:  Okay.  So maybe -- I thought I
         6          understood you to say you were content -- or the
         7          trustee was content not to have answers or content to
         8          conclude today without those answers?
         9               MR. LEAVERTON:  The latter, Your Honor.  The
        10          situation is that we're going to have to get the bank
        11          records to complete the examination anyway.  And
        12          although there, as you know, substantial briefing in
        13          the record on the Fifth Amendment issue and the like --
        14          and unless -- I mean, we certainly would welcome the
        15          Court ruling today.
        16               And I can tell you, really, where the rubber
        17          meets the road on these issues.  There's a banking
        18          institution in Jamaica that involved a number of
        19          pre-bankruptcy activities involving this debtor.  And
        20          there are, in the record established today, several
        21          occasions where the debtor has been to Jamaica on
        22          several occasions since August of 2005 when he came to
        23          this country.  And our examination of the witness on
        24          questions concerning property owned in Jamaica, the
        25          Bank of Jamaica, accounts in the Bank of Jamaica --

                                                                      12

```
 1                    THE COURT:  Is that the name of the bank?  Or

 2          is that just a bank in Jamaica?

 3                    UNIDENTIFIED SPEAKER:  It's the National

 4          Commercial Bank of Jamaica.

 5                    MR. LEAVERTON:  National Commercial Bank of

 6          Jamaica is the name of the institution.  And that

 7          really is an important area for the trustee's inquiry.

 8          That's where the parties have a dispute as to whether

 9          the Fifth Amendment has vitality or not.

10                    There is a further complication, which

11          actually, Mr. Thow's criminal counsel may be able to

12          address regarding -- I believe there are Canadian rules

13          -- they don't have a Fifth Amendment, but they have

14          something similar.

15                    THE COURT:  I know, the Canadian Charter of

16          Rights, I think it's called.

17                    MR. LEAVERTON:  Right.

18                    THE COURT:  I believe it's -- I have some

19          very sketchy knowledge of that.

20                    MR. LEAVERTON:  But apparently, the procedure

21          is that you can assert the right, and then you're

22          required to answer the question anyway.  But the answer

23          can't be used in a criminal prosecution, unlike our

24          procedure.  And so one of the interesting questions is

25          whether that regime, the Canadian approach in law and
```

13

```
 1      rights really apply to this proceeding, or whether it's
 2      the Fifth Amendment or both or neither.  Well,
 3      certainly one or the other does, and maybe both.
 4              So those are the issues that we would --
 5              THE COURT:  I haven't heard one way or the
 6      other -- and I'm not pressing counsel for a response --
 7      but whether or not there are potential U.S. criminal
 8      proceedings or actual U.S. investigations proceeding
 9      that may make a difference in the answer to that
10      question.
11              MR. LEAVERTON:  I think if I knew the answer
12      to the question, I'm not sure I could say whether there
13      was a criminal proceeding.  But I know there -- or an
14      investigation.  But I know there's no proceeding
15      pending.  There's no prosecution or indictment.
16              THE COURT:  Okay.  Ms. Feinstein or
17      Ms. Riley?
18              MS. RILEY:  Thank you, Your Honor.  Again,
19      Jessica Riley appearing on behalf of the debtor
20      specifically, as this matter pertains to his criminal
21      liability in Canada.
22              Mr. Leaverton, I believe, addressesed the two
23      issues that involve my representation.  Number One,
24      whether or not -- it is our belief that Mr. Thow has
25      the right to invoke the Fifth Amendment in this
```

14

```
 1        proceeding based on the risk of prosecution in a

 2        foreign territory, that being Canada.  There is an

 3        investigation -- a criminal investigation there that

 4        has been completed and referred to the Crown.  And it

 5        is our understanding -- my understanding from

 6        conversing with his attorneys in Canada that charges

 7        there are imminent.  The process is just a little bit

 8        slower -- or it's taking its time.  And my guess is

 9        that is because it's --

10             THE COURT:  Probably a pretty complex case.

11             MS. RILEY:  It's a complex case.  It's not a

12        serious violent crime where we run out and arrest

13        people immediately.  So they're taking their time to

14        determine what criminal charges, if any, are

15        appropriate.

16             Fifth Amendment aside, in conferring with his

17        Canadian counsel, I brought the issue up with

18        Mr. Leaverton and the attorneys regarding whether or

19        not what arm of law governs this proceeding.  Because

20        if, in fact, we are going to say that the Canadian law

21        controls, Mr. Thow may be able to answer a number of

22        these questions while maintaining protections --

23        protection of himself from criminal liability in the

24        Canadian courts.

25             So I guess I'm asking for leave of this Court
```

15

```
1        for us to be able to address this issue.  It's

2        obviously a very complex one.  It probably doesn't come

3        before Your Honor very often.

4               THE COURT:  "Never" would be an accurate

5        description.  I tell you, my last involvement with

6        Canadian justice was when I was a deputy prosecutor in

7        Pierce County -- which is a long time ago -- and a

8        Canadian soldier, who was on duty at Fort Lewis in some

9        kind of exercise, turned a truck down an on-ramp to

10       I-5.  And of course, there was a very drunk soldier

11       coming up the on-ramp.  Luckily, nobody was very much

12       injured.  The state patrol trooper wrote a ticket.

13              You know, I was just the deputy prosecutor

14       assigned, and suddenly I get a letter from a colonel in

15       and Esquimalt or someplace like that saying, You can't

16       prosecute under the NATO Status of Forces Agreement.

17       So I looked at it and said, I think you're right and,

18       you know, please tell us what happened.  We would have

19       fined him, but, you know, had we convicted him.  And he

20       ended up spending a couple of days in jail, apparently.

21              So I don't know if that's relevant in the

22       slightest, but I have had a very slight involvement

23       with Canadian criminal -- Canadian military justice

24       anyway.

25              MS. RILEY:  I believe we will do our best to
```

```
 1      untangle it for you.

 2              THE COURT:  Well, I'm not sure what to say

 3      today.  I'm not ready to make any kind of rulings at

 4      this point.  I think I probably would want to see the

 5      questions framed in terms of pleadings and, you know,

 6      with the specific aspects sort of laid out.  Because

 7      I'm not quite sure -- I take it, from what

 8      Mr. Leaverton said, you're going to want to get

 9      documents from the financial institutions.  That's

10      likely to take some time.  So we're probably looking at

11      least a couple of months out before we get to this?  Or

12      do you know?

13              MR. LEAVERTON:  Well, I know the -- I'm

14      certain that Mr. Cheevers would like it to be on a

15      faster track than a couple of months.

16              THE COURT:  Sure.  Well, I guess that's a

17      question.  Are these two so interrelated that we should

18      resolve the Fifth Amendment and testimony kind of

19      questions before we get -- well, are there questions

20      with respect to the bank records other than you just

21      needing time to get them?

22              MR. LEAVERTON:  I don't believe that

23      Mr. Thow's counsel objects to our subpoenaing the bank

24      records and obtaining them.  And so that's just a

25      matter of getting the subpoenas out into the banks.  I
```

17

```
1      know we'll get responses pretty rapidly.  We're really
2      looking at the electronically-maintained bank records,
3      and we're not really going to look into --
4             THE COURT:  You're not looking for copies of
5      checks, et cetera, at this point.
6             MR. LEAVERTON:  Correct.  So I think that
7      will go fairly rapidly.  I think, as I say, probably
8      the burden is on me to move to compel responses and to
9      provide the Court with the questions and the
10     objections.  And then I'm certain that Mr. Thow's
11     counsel will want to have the Court determine the
12     Canadian -- the choice of law issue, if that's
13     possible, in that kind after motion.
14            THE COURT:  Well, in that regard, the choice
15     of law question, particularly involving criminal
16     matters, do I need to -- does someone need to ask the
17     Department of Justice to take a position?
18            MS. RILEY:  If I may respond, Your Honor?
19            THE COURT:  Sure.
20            MS. RILEY:  I don't believe that's
21     necessarily the issue, because we're not -- the
22     question isn't whether it's Canadian criminal law
23     versus American criminal law.  It's what sovereign
24     nation is governing this bankruptcy and what laws apply
25     to this bankruptcy.  It's, I think, the overreaching
```

```
 1      issue.  And if it's Canadian law --

 2              THE COURT:  Well, let me pose a hypothetical.

 3              MS. RILEY:  Sure.

 4              THE COURT:  Say the outcome of --

 5      Mr. Leaverton makes his motion, and the outcome is

 6      everybody here thinks, well, the Canadian procedure

 7      governs, and I order that he answer the questions.  He

 8      answers the question, and six months later, we don't

 9      know why, but there's a grand jury indictment against

10      Mr. Thow in the United States for something.  The

11      possibility then is my ruling might have been wrong,

12      and nobody involved in the prosecution, you know, with

13      an interest on the part of the Government or whoever's

14      prosecuting, whichever government it is, probably has a

15      fair shot at that question again.

16              And I don't know if there's a way to preclude

17      that, or whether it's a take-your-chances situation no

18      matter what we do.  But one of the possibilities is

19      this is a brand-new statute, and maybe the Justice

20      Department wants to weigh in on that question.  I don't

21      know.  This is, literally, the first Chapter 15.

22              MR. LEAVERTON:  Right.  We could certainly

23      notify the Department of Justice of the motion and put

24      them on notice and put the Canadian authorities as

25      well, for that matter, on notice.
```

19

```
 1              MS. RILEY:  And I do think --

 2              THE COURT:  I mean, I'm not trying to make

 3      this more complicated than it is.  But I'm trying to

 4      think through what the possible implications are before

 5      we get too far down the road.

 6              MS. RILEY:  From my conversations with

 7      Mr. Thow's Canadian criminal defense attorney, I don't

 8      believe that there is any possibility of prosecution in

 9      the United States.  That could be wrong, obviously.

10      I'm not giving a definitive answer to the Court.  But

11      that has been my understanding, which is why the case

12      has now been forwarded to the Crown.

13              We anticipate there should be something

14      definitive very shortly with regards to criminal

15      charges.

16              THE COURT:  And "forwarded to the Crown"

17      means the prosecution service has decided whether or

18      not to bring charges.

19              MS. RILEY:  Exactly.  "Forwarded to the

20      Crown" means it has left the Mounties, which would be

21      the police agency investigating the case.  They've

22      packaged it up and passed it on to the prosecutor.

23              THE COURT:  The equivalent of the FBI sending

24      something to the U.S. Attorney.

25              MS. RILEY:  Exactly.  So the case is with
```

```
 1    them.  And from my conversations with his defense

 2    attorney in Canada -- and I will readdress this issue

 3    -- I don't believe there's any criminal liability here

 4    in the United States.  But obviously, before we go

 5    forward, I'll get something more definitive on that.

 6              THE COURT:  Well, my hazarding of the idea of

 7    a couple of months was just that I assumed that's how

 8    long it was going to take to be getting bank records.

 9    But I'm not -- whenever it's ready, we will do it.  I

10    mean, if you want to note up a motion, we can do it,

11    you know.  And if it has to be expedited, you know, we

12    can do that to some extent.  But if it really needs

13    notice to other folks who aren't here, it would

14    probably be appropriate to figure out who those folks

15    are.

16              MR. LEAVERTON:  Right.  I think that's, you

17    know, probably, to be discrete, that's probably

18    Mr. Thow's issue and not the trustee's issue --

19              THE COURT:  Sure.

20              MR. LEAVERTON:  -- as far as involving other

21    governmental agencies.

22              THE COURT:  If there's any concern about

23    that.

24              MR. LEAVERTON:  Right.  So, you know, we'll

25    confer, counsel and I, and see if we can get it
```

21

```
 1        resolved.  If she doesn't have an issue, then we'll

 2        present it, you know --

 3                THE COURT:  Sure, that's fine.

 4                MR. LEAVERTON:  And if she has an issue, then

 5        we'll have to address that as far as --

 6                THE COURT:  And one of the complicating

 7        factors, if there is any interest on the part of the

 8        Government, is it will take them a while to respond

 9        because they'll probably want to respond out of D.C.

10                MR. LEAVERTON:  Right.  Then we're talking

11        several months.

12                THE COURT:  Well, they can do some things in

13        a hurry back there.

14                MR. LEAVERTON:  That's true.

15                THE COURT:  So I think where we are is that

16        there will be a motion sometime soon on the answering

17        the questions issue, and perhaps later on the bank

18        records.  And perhaps not.  Perhaps just simply a

19        reconvening of the 2004 exam on that.

20                MR. LEAVERTON:  I think just to make the

21        record clear, we're comfortable, I think, all of us,

22        that the 2004 order covers subpoenaing the bank records

23        from Washington Mutual and from Key Bank.  And I

24        believe there's one other institution.  And then Wells

25        Fargo getting 2007 documents.  So those subpoenas will
```

```
1        go out very rapidly.  And then I think it's the fifth

2        Amendment and the Canadian counterpart issue.

3                   THE COURT:  All right.  We'll be at recess.

4

5                        * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         CERTIFICATE

 2

 3              ROBYN OLESON FIEDLER certifies that:

 4

 5              The foregoing pages represent an accurate and

 6     complete transcript of the entire record of the

 7     digitally-recorded proceedings before the HONORABLE

 8     PHILIP H. BRANDT presiding, in the matter of THOW; and

 9

10              These pages constitute the original or a true

11     copy of the original transcript of the proceedings.

12

13              Signed and dated this 26th day of November,

14     2007.

15

16

17                         AHEARN & ASSOCIATES

18

19

20              by |s| Robyn Oleson Fiedler
                   ROBYN OLESON FIEDLER, Notary
21                 Public in and for the State of
                   Washington, residing at Buckley.
22

23

24

25
```

24